UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JUN - 2 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

STEVEN IVEY,
7611 S. Orange Blossom Trail, #278
Orlando, FL, 32809,

    Plaintiff,

V.

JOHN SNOW, Secretary,
U.S. Department of the Treasury,
1500 Pennsylvania Ave, NW
Washington, DC, 20220,

    Defendant.

Civil Action No.

CASE NUMBER 1:05CV01095

JUDGE: Emmet G. Sullivan

DECK TYPE: FOIA/Privacy Act

DATE STAMP: 06/02/2005

## COMPLAINT PURSUANT TO THE PRIVACY ACT AND FREEDOM OF INFORMATION ACT

Pursuant to the Privacy Act, **5 USCS 552a (g)(1) B** ;

**5 USCS 552a (g)(1)D** , the **Freedom of Information** Act and Rule 8 of Civil Procedure the plaintiff is requesting Court review of the following complaint in regards to the defendant, U S Department of the Treasury, for improper procedure, and refusal to supply requested records and files.

1

13. The official IRS job descriptions and duties of the following positions:

    Data Transcriber; Conversion Branch Manager: Conversion Branch Supervisor:

    Code and Edit employee; and Conversion Branch Lead

14. Statistical data of all settled or pending civil action/lawsuits against the US Treasury from 1998 to 2002.

15. The Treasury's outline and procedure for restructuring as labeled " Leading in the New IRS " during the period between 1999-2001 tax seasons.

16. The IRS record of changes to the rules and procedures as to be reflective and needed for the changes to tax law and filing procedures.

17. The list of documents that the IRS/Treasury included as part of the "system of records" maintained by the Treasury for employees.

18. The IRS/Treasury's official procedure for processing violations of insubordination and for the disclosure of violations to rules, regulations, and laws. The IRS's official procedure for the filing and processing of such complaints.

19. The documentation/proof of calls made to the Treasury Union as reportedly made by the plaintiff which were included in the Treasury EOP File 02-1135.

20. The "file on Steven Ivey" or the list of its contents as referenced by Linda Ferguson, in her testimony for the EOP File 02-1135.

21. The consent documentation of Jennifer Smith for use of information of her as used by Kelly Mancle for the EOP 02-1135 file.

## REQUEST OF THE COURT

The palintiff request the Court to determine that the refusal of the Treasury to supply the requested documentation unlawful and to supply all requested documentation and information. Determine and award the

4

plaintiff the relative costs and fees associated with the action and other relief as to it discretion.

**The plaintiff is requesting that the Court appoint the plaintiff an attorney. (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C 2000e** *et seq*: **the Rehabilitation Act of 1973, as amended, 29 U.S.C.   791(e).**

_May 2, '05_
         Date

_____
                  Plaintiff
Steven Ivey
7611 S. Orange Blossom Tr., #278
Orlando, FL, 32809

5

MAY-01' 01 (TUE) 09:35   A   RECTOR OFFICE                    77   55 2262       P. 002
FEB-15-2001   14:07                                                               P. 05/31

# COMPLAINT REFERRAL MEMORANDUM
### (Response Required)

**1. Address of Receiving Official**
National Director, Commissioner's Complaint Processing and Analysis Group
1111 Constitution Avenue, NW   Room 6617
Washington, DC 20224

**2. Date Forwarded:** DEC 20 2000

**3. Date Response Due to TIGTA:** JUN 20 2001

**4. TIGTA Complaint Referral Number:** C200007764

**5. IRS Number:**

**6. "1203" Violation Alleged:** ☐ Yes ☒ No

**7. Complaint Title or Name of Employee (Subject):** CONFIDENTIAL COMPLAINANT

**8. Position, Series and Grade:**

**9. Office (Headquarters):**

**10. Post of Duty:**

**11. Remarks**

**12. Name, Signature, Title and Telephone Number of TIGTA Official**
Karen J. Parker, Assistant Special Agent-in-Charge
Complaint Management Division (202) 927-7187 fax (202) 927-7018

**13. Address of the TIGTA Office Referring Complaint**
Complaint Management Division
Post Office Box 589
Ben Franklin Station
Washington, DC 20044-0589

**14. Name, Signature and Title of Receiving Official:** Christine Wickham CCP&A

**15. Date Received:** 1/5/01

**16. Administrative Action(s) Taken and Effective Date(s) Proposed:**
A. ☐ Clearance Letter Issued
B. ☒ Closed – No Action Taken
C. ☐ Oral or Written Reprimand/Admonishment
D. ☐ Suspension/Reduction in Grade
E. ☐ Removed/Terminated
F. ☐ Employee Resigned Prior to Adjudication
G. ☐ Returned – TIGTA agreed to Investigate
H. ☐ Other (Explain in item 18)

**17. Contact Person and Telephone Number**
T. O'Brien   (770) 455-2214
Field Director, Submission Processing

**18. Other Information**

Effective Date(s): _____
Block 22 available for additional comments

**19. Name, Signature, Title and Telephone Number of Returning Official**
T. O'Brien, Field Director, ATSPC   (770) 455-2214

**20. Date Returned to TIGTA:** JUN -2 2005
MAY -1 2001

FILED
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Form 2030 (Rev 01/2000)   Treasury Inspector General for Tax Administration

05 1095

wasn't sure. Pam stated it was a "he" and the individual was Steve Ivey as these were the same issues that Steve brought up in another allegation. She stated he was terminated during his probationary period last week. He had worked for 9 ½ months and had performance issues and was not making rates. When he was terminated, he stated it was all a conspiracy against him because he was "white." He accused management of manipulating his TEPS when he wasn't doing well, saying that he was a math major and knew management had manipulated the TEPS. I asked Pam if she was aware of an invitation given to an "individual" to attend a "gay pride party." She said, "Yes, the invitation also mentioned it was a naked pool party and that an employee named [REDACTED] had given out the invitations. She said Robert Hall, Expansion Night-Shift Section Chief, had addressed this with [REDACTED] and counseled him. [REDACTED] was very apologetic and said that he really believed Steve Ivey was gay," and that was why he gave him an invitation. He had also given an invitation to others in the Section. I asked Pam if she was aware of the issues the Complainant raised regarding the noise level during the first year (1/99 to 7/99), when he was in Kelly Mancle and Winda Daniels Units. She was aware of it and also that he had called Judy Jordan, another Section Chief. Judy had addressed it and spoke to his manager, Winda Daniels. Pam said that she was his Section Chief last year. She further stated that Kelly Mancle, Winda Daniels, and Judy Jordan wrote affidavits to address a list of concerns that he had raised previously. Pam stated that she had the manager address the entire unit regarding the noise level. Pam also said she addressed noise levels in Section meetings with her managers and would ask all managers to tell employees to keep the noise level down.

I asked Pam if Data Conversion employees have pens to mark up the returns. She replied, "No, they do not mark the returns." Regarding the Presidential Election Boxes, only Code and Edit in the Document Perfection Branch codes/marks returns in "red" pens. Employees in Data Conversion are mandated to key in required items on the return.

I asked Pam how the work was distributed. She explained that the leads and managers bring the carts to the work area and the employees get their own work. Employees sign out batches, working from left to right off the carts. The sign-out sheet record is kept on top of the cart. She said there is no way that the Complainant was given batches that were illegible. He could have picked up a batch that had returns that were not legible, just as any other employee working from the cart could.

Pam suggested that I talk with Kelly Mancle as she was the Post Training coordinator this year. Pam said that the Complainant read a book and would not participate in class and was counseled regarding this matter. I asked if he signed memos when he was counseled, but she said he always refused to sign them.

Per Pam, these are the exact same issues that he (Steve Ivey) presented before. Pam also stated that because of being furloughed each year, his 1-year probationary period was delayed. He had worked 9 ½ months when told he would be terminated during his

Report Of Inquiry            4            ECMS # 0101-4SVJPLCJ

probationary period because he was not performing. He was told he could resign, but he refused and was terminated. Pam also stated this individual is 40 + years old.

I asked Pam whom else I should interview. She recommended the following:

Kelly Mancle, Expansion Manager
Judy Jordan, Section Chief
Winda Daniels, Expansion Manager
Robert Hall, Expansion Section Chief
Lisa Lee, Expansion Manager.

**Interview with Robert Hall, Night Expansion Section Chief 3/15/01 at 7:10 p.m. (Robert Hall replaced Judy Jordan as Section Chief, as Judy is currently on a detail).**

I asked Robert if he recalled a conversation with a unit manager (page 6 of the letter dated 11/1/00) regarding a conversation relating to a return where the math looked correct but was not and if he observed anyone looking at him during the conversation. Robert does not recall the conversation. I asked if Winda Daniels was one of his managers. He stated that she was. I asked if he was aware of a complaint by an employee that employees and managers were bumping the back of his chair intentionally. Robert was not aware of this, but said that Winda Daniels might be aware of it. I asked if Robert received complaints on the noise level. He said he did not receive any direct complaints from anyone. However, as a Section Chief, he would walk around on the floor if it got noisy. He said that as a new Section Chief, he was on the floor often. I asked if he knew if someone was given an invitation to a "gay pride party." He said he did and that the person who gave the invitation ▓▓▓ works in his Section. The manager, Kelly Mancle, counseled ▓▓▓▓▓ and told him not to do it again. ▓▓▓▓▓▓▓ had said he didn't think it would offend anyone. Robert said that the invitation also had something to do with a pool party and naked people and that it was given to both straight and gay employees.

Robert stated that he thought the Complainant was the same individual who was fired last week. Someone from Labor Relations/NTEU attended the meeting to terminate Steve Ivey and he brought up all of the stuff mentioned as issues in the complaint letter; i.e., managers and employees bumping his chair etc. He (Steve Ivey) also admitted in this meeting that "he got his own work off the carts." He was being fired for performance issues in not meeting the TEPS base points. He brought up the fact that he received work that was not legible.

I asked Robert if he addressed the noise level issues. He said he did address the noise issue during unit meetings and that he also walked around the units much of the time.

Report Of Inquiry                              9                    ECMS # 0101-4SVJPLCJ

I asked if she observed people sabotaging the equipment intentionally; i.e., spilling drinks on keyboards and eating food. Winda said she had a meeting regarding the furniture and equipment as the units all got new furniture. All employees were told there could be no soda and no styrofoam cups. If employees have a drink, it must have a screw on cover and a straw. Also, employees may not sit, stand, or prop their feet on the furniture.

Winda said Judy Jordan did meet with her to inform her that someone had complained about the noise in the unit, and she had a meeting with everyone in the unit on this issue. She said Steve Ivey approached both Judy Jordan and Pam Blackburn about the noise in the unit. Winda said they both informed her, and she explained that she had a unit meeting and told everyone that they needed to "respect one another."

I asked if she had counseled the Complainant on his ratings. She said, yes, and that she had explained to him what he needed to do to improve. Winda said that he sat on the back row where people passing him were talking and walking back and forth coming down the aisle when they went on break, etc. Also, the carts were kept near him and employees had to go behind him to get and sign out their work. She asked the employees to stop taking the aisle next to him and to use the main aisle. Winda said the Complainant never wanted anyone walking behind him and he would bring this up. She said she explained to him that there are so many people in the service center that people did have to walk behind him. She said that because he propped up his feet and leaned back, employees bumped his chair when going behind him to sign out work as there was not a lot of space. She asked him not to prop up his feet. She offered to move him and he did move and sat by himself next to a pole where there were no other terminals around him. However, there were people behind him that would unintentionally hit his chair when getting by.

I asked Winda if she was aware of a complaint about baby showers and parties that were held in the unit that wasted time. Winda said participation in these events was voluntary during employees' own time for breaks and dinner, and that she had explained to Steve Ivey that he did not have to participate. His complaint was also about birthday celebrations and employees asking for money. These activities were also voluntary, and he did not have to participate.

I asked Winda if she knew of an[REDACTED] that burped and passed gas. She said she did and that she verbally addressed the unit as well as [REDACTED] individually. She told them that it was a close area and that they needed to leave and go to the restroom if they felt a problem coming on. She said it was OK to just leave for that purpose.

I asked Winda if she recalls anyone asking for time off for school. She said she did recall the Complainant asking. She said she went to the Section Chief and inquired, but it was a branch decision that no one would be granted time off because it was peak season. Winda said she did explain the exception that if someone was in the Army Reserves, the IRS was required to release them. I asked Winda whom else I should interview, and she recommended Joyce Holmes.

Report Of Inquiry                        11              ECMS # 0101-4SVJPLCJ

However, Joyce stated that all the employees were told showers and birthday parties were voluntary, and that they had to use their two breaks or lunch period for the party; they were not given additional time.

I asked if she was aware of any employees intentionally spilling drinks on the computers and keyboards, or whether employees had food in the unit. Joyce stated that employees had to follow strict rules concerning liquids in the unit. Drinks could not be in a cafeteria cup or a McDonalds cup, but had to be in spill proof cups only. This was addressed in the Expectation Meetings. The only food that was allowed was hard candy. If the unit had a "goodie day," it had to be held in the cafeteria and not in the unit.

Joyce stated that Steve rarely talked to anyone and was always by himself. I asked if he was offered the opportunity to move his seat. She said that he was moved at the end of the season and sat next to a pole. She said employees had complained that he was leaning back in his chair when they went by him, and they probably were unintentionally bumping his chair because it was a tight area. Joyce said he stayed to himself and never really had conversations with anyone that she is aware of.

I asked if she was aware if ▓▓▓▓ had burping/bodily function problems. Joyce said she recalls that if ▓▓▓▓ burped, then the Complainant would burp, thereby adding to the problem. She said she knows Winda counseled them both.

Joyce stated that she sat a row over from the Complainant, but had little direct contact with him. If Winda was out, Joyce passed out the time sheets, etc., but he was not complaining to her.

Interview with Lisa Lee, Manager 3/22/01 6:00 p.m.

I provided an overview of the Complainant's issues.

I asked Lisa what unit she had in Filing Season 2000. She stated that she had Team 3. I asked if she recalls anyone complaining of noise in the unit. Lisa said that several people complained of noise, not in her unit but coming from the unit next to her's belonging to Carlett Reese. I asked her what she did in response to those complaints. She said she spoke with the manager and lead in the unit making the noise. Lisa said there were just a few disruptive employees and their manager spoke to them.

I asked Lisa if she recalls anyone complaining that employees were mimicking him/her. She said she did not. I asked if anyone complained about employees burping and making other bodily noises. She stated, "No."

I asked Lisa if anyone told her that employees were filling in the Presidential Election Box on taxpayer returns. She said, "No." Lisa said she used to work in Code & Edit where this is checked to see if it is coded, and that employees hardly looked at it. I asked how long ago she worked in Code & Edit and she responded that it was 15 years

Report Of Inquiry					13			ECMS # 0101-4SVJPLCJ

read a book while leaning back in his chair. She didn't notice whether he ate at his desk, but doesn't recall seeing him eating. Lisa stated that he sat on the end away from her desk. Lisa also added she kept the carts of work near her desk and the employees had to come up to get it.

I asked Lisa why she thought Steve Ivey was placed in her unit. She stated that Pam Blackburn, the Section Chief, felt the move would be good after the first letter complaining about Winda Daniels and the problems he had with her. She also felt it was because she was a "white manager." She said that her unit is not into having parties and that, as she recalls, they had one baby shower that year and attendance was voluntary. Also, she said that she and the lead, Regina, are not loud and boisterous like Winda Daniels and Joyce Holmes, who are loud and outgoing.

Lisa stated that she would look into any complaint issues he mentioned, i.e.; noise, and then have a unit meeting and reiterate that employees had all signed the Expectations Package and needed to keep the noise down.

I asked Lisa if her unit worked a part-time or a full-time shift. She answered that it was full-time from 6:00 p.m. to 2:30 a.m., and that she did not have any part-time employees.

I asked if she had observed if Steve Ivey had contact with the Code & Edit Unit as the Complainant mentioned Code & Edit regarding the Presidential Election Box and also audit codes for the north side of Atlanta. Lisa stated that there is a wall between Data Conversion Branch and the Error Correction Unit, which is before the Code & Edit Unit. She said she never observed Steve talking with anyone as he kept to himself.

I asked why Steve Ivey was recently terminated during his probationary period. Lisa stated that his quantity was OK, but he was not meeting Quality standards and was insubordinate. I asked if she participated in his termination and whether she was in the room when he was told. She said she had not participated, and that Robert Hall, Section Chief, handled it with a Union Steward, Doug VanBuren. She is not sure if Labor Relations was in the room. They did give Mr. Ivey the option of resigning. She said he didn't resign and, per Doug Van Buren, showed no emotion.

I asked Lisa if the Complainant talked to many people. She said no, last year there was an empty seat beside him so he was away from people. She said he did speak with another employee ▓▓▓▓▓▓▓▓ that she thinks came through training with him.

Lisa offered the following: Last year he made a drastic change in his appearance. He shaved his head and would wear a baseball hat. This year, he grew a long pointed goatee, and still wore the baseball hat with the shaved head.

I asked how he was when he returned this filing season 2001? Lisa said that Steve Ivey looked at management as beneath him. He was very condescending and would question her answers. She didn't think he liked a woman for a boss. He took

Report Of Inquiry                     14               ECMS # 0101-4SVJPLCJ

instructions or directions only as a "suggestion," i.e.; she would explain the errors he made in Quality and he would shrug it off.

I asked if she was aware he was a math major. Lisa was not aware of this.

I asked if he complained about baby showers in the unit. She said he had never complained, but she only recalls having one shower last year and she didn't organize it.

I asked Lisa if she knew if drinks were intentionally spilled to damage the key boards, or if she observed or received any complaints about eating food in the work area. She said that it was not a problem last year. She said a few employees would eat potato chips and, if they were caught, she would counsel them and reiterate the Expectation Package policy on no food in the Unit.

I asked if there was a problem this year with a refresher class the Complainant attended when he returned. She said yes, Robert Hall was looking for him. Steve Ivey showed up at Lisa Lee's desk asking what he could do. Lisa told him to see Kelly Mancel because she is supposed to tell him what to do as she was teaching refresher training to all the new returnees. She said Steve ignored her and left early, stating he had surgery and was on medication and that he was going home and would try again tomorrow. I asked if he complained about the Refresher Class. Lisa said yes, he thought it was disorganized and he didn't need to attend as he knew it all. The students were supposed to get their passwords that evening, but he didn't get his. Lisa recalls that when his first samples were pulled for Quality, he had 6 out of 10 errors and she thought, "and you didn't need to attend refresher?"

Lisa said that last year the Complainant made comments to her that when he was in Winda Daniels' Unit in 1999, his mail from his Post Office Box was being opened. Also, after he started working for the IRS, he thought someone was following him, he was "tailed," and people were opening his mail. Lisa told him she would relay it to her Section Chief.

I asked if Lisa if she knew someone named ▓▓▓▓ She replied that yes, she knew ▓▓▓▓▓▓▓▓▓ who is a very loud lady who still works in Carlett's Unit.

I asked if Lisa knew if overtime was abused. The Complainant stated that people worked overtime, but didn't put in all the hours reported, or else they disrupted the work area when they were supposedly working, and yet their managers recorded their overtime. Lisa stated that seasonal part-time employees do work overtime, but they must be fully successful. Steve was not fully successful and did not work overtime. Overtime is worked from 2:30 a.m. to 4:30 a.m., and no baby showers or parties are ever held during overtime. The Complainant stated that managers are allowing employees to fool around and have parties during overtime. Lisa said she works overtime and when she does, she is sitting in the Unit with the employees working. When a manager is with them, they are all quiet and working. She also said the Sections and Branches are always looking for good production numbers during

The following list many of the documents that the plaintiff has requested:

1. From the attached document #1, from the Commissioner's Complaint Processing and Analysis Group, I am requesting the information under the blackened areas. These are particularly the names of accusers which I have a right to know as the accusations are false and, additionally, relative to civil actions 04-0394, 04-0395, 04-0396 and 05-0176.

2. Copies of my last paycheck and paycheck receipt as received in March 2001.

3. The copy of an incentive check I received during September 2000 as a result of the program at the IRS Doraville Processing Center.

4. The statistics/ratio of the gender and racial of the IRS Doraville Processing Center from 1998 to 2001.

5. The number of data transcribers at the IRS Doraville Processing Center which were terminated for "poor rating" with their relative gender and race for the period beginning 1998 to 2001, inclusive.

6. The statistics for the rate and "turn over" of the new data transcribers during the period from 1998 to 2001, inclusive, with relative gender and race statistics.

7. The Civil Rights Compliance Reports for the Doraville Processing Center from 1998 to 2002. Also for the Treasury during this period.

8. The number and copies of the reports filed as per the Restructuring and Reform Act of 1998 of the Treasury Department for the period from 1998 to 2002.

9. The manuals for processing the relative 1040, 1040A, and 1040EZ tax returns for each year of 1999, 2000, and 2001.

10. The training manuals and relative videos for the training of data transcribers for 1999, 2000, and 2001. Also any related amended corrections to said manuals.

11. The procedural manuals for the Code and Edit division at the Doraville Processing Center for 1999.

12. The listing of Data Transcribers for the Doraville Processing Center by statistical ratios of gender and race for each tax season of 1999, 2000, 2001, and 2002.

3

## COMPLAINT

The plaintiff has requested information from the Treasury as per public information, documentation for concerning the plaintiff, and for investigations and legal proceedings for relavent evidence. Enclosed herein is a list of information and documentation requested in proper order and time beginning in November 2003. More particularly, documentation as requested for investigations and legal proceeding have been refused by the Treasury in an effort to persued the outcome of corrective action.

## STATEMENT OF THE FACTS

The Treasury has had numerous opportunities to supply the requested information as requested by the plaintiff in the EOP investigation July 2002, MSPB hearings December 2003, and relative civil actions but states that these request are unduly and not relevant to the respective cases. Repeated attempts have been made for documentation. The expiration of time limits has most recently been April 2005. However, the Treasury has complied and demonstrated that what records it has supplied have been falsely compiled.